# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,     )
)
)
)
v.     )      I.D. No.: 1605014261
)
)
NAKEEM BAILEY,     )
)
Defendant.     )

## MEMORANDUM OPINION AND ORDER

Submitted:   December 22, 2016
Decided:      March 2, 2017
Corrected:    March 10, 2017

*Upon Consideration of Defendant's Motion to Transfer Charges to Family Court.*

**DENIED.**

Mark A. Denney, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State.*

Patrick J. Collins, Esquire, Patrick Collins & Associates, LLC, Wilmington, Delaware. *Attorney for the Defendant.*

**MEDINILLA, J.**

## INTRODUCTION

Defendant Nakeem Bailey was a fifteen-year-old adjudicated delinquent youth when he was arrested on violent felony charges in this Court. His IQ of 72 places him in the 3rd percentile of his same-aged peers. If convicted as an adult, he will spend—at a minimum—the next half of his life (i.e., fifteen years) in prison on just the minimum mandatory portion of his sentence. He filed this Motion to Transfer Charges to Family Court arguing that transfer of his companion charges is warranted pursuant to 10 *Del. C.* § 1011. A "reverse amenability" hearing was held on December 22, 2016, where the Court heard evidence and oral arguments on the Motion. After considering the submission of the parties, the parties' oral arguments at the hearing, and the record in this case, the Court finds that the § 1011(b) factors do not weigh in favor of transferring Defendant's companion charges to Family Court. Therefore, Defendant's Motion to Transfer Charges to Family Court is **DENIED**.

## FACTUAL AND PROCEDURAL HISTORY

Sadly, Defendant is yet another poster child for why the State created the Department of Services for Children, Youth and Their Families ("DSCYF"). Even more unfortunate is that this Defendant has required the State's involvement from all of their divisions; Division of Family Services ("DFS") for child abuse, dependency, and neglect; Division of Prevention and Behavioral Health Services

("PBH") for his multiple mental health diagnoses; and Youth Rehabilitative Services ("YRS") for his most recent introduction into the juvenile justice system at age fourteen.

Defendant is one of twenty-eight defendants in a 109-Count indictment with trial scheduled to begin at the end of 2017.[1] Defendant has been detained since he was fifteen years old and will have celebrated his sixteenth and seventeenth birthdays awaiting trial. The charges against Defendant include Gang Participation, three counts of Possession of a Firearm During Commission of a Felony ("PFDCF"), Robbery First Degree, Assault First Degree, two counts of Possession of a Firearm by a Person Prohibited ("PFBPP"), Conspiracy Second Degree, and Carrying a Concealed Deadly Weapon.

## Exclusive Jurisdiction of Firearm Charges

The General Assembly has spoken with respect to how it defines criminal behaviors and exercised its authority to classify child offenders "based on their age for purpose of selecting the appropriate court for adjudication."[2] The classification "must be founded on differences reasonably related to the purposes of the statute in

---

[1] Defendant was arrested in May 2016, arraigned in August 2016, re-indicted in September 2016, re-arraigned in October 2016. A reverse amenability hearing was held on December 22, 2016.

[2] *State v. Anderson*, 697 A.2d 379, 382 (Del. 1997) (quoting *Hughes v. State*, 653 A.2d 241, 248 (Del. 1994)).

3

which the classification is made."[3] Delaware law is clear that, by enacting 11 *Del. C.* § 1447A(f), the General Assembly intended that individuals over the age of 15 years charged with PFDCF to be tried as adults and no reverse amenability process is available.[4]

Twenty years ago, *State v. Anderson* addressed the constitutional issues raised when certain juveniles are placed within the exclusive jurisdiction of this Court charged with [specified firearm offenses].[5] *Anderson* held that a juvenile was not entitled to a reverse amenability hearing when charged with PFDCF and must be tried as an adult without judicial consideration of the factors enumerated under 10 Del. C. § 1011(b).

Although some jurisdictions have recently considered unconstitutional certain "automatic transfer" statutes that prevent amenability review for a juvenile offender,[6] Defendant does not challenge the constitutionality of our current laws for juveniles charged with firearm offenses. As such and as a preliminary matter, because the State has charged Defendant with several counts of PFDCF, those

---

[3] *Id.* (quoting *State v. Ayers*, 260 A.2d 162, 171 (Del. 1969)).

[4] 11 *Del. C.* § 1447A(f) (2013 & Supp. 2016). *Cf. Anderson*, 697 A.2d at 383 (discussing older version of § 1447A(f), which used 16 years of age instead of 15).

[5] *See generally Anderson*, 697 A.2d 379.

[6] *See, e.g., State v. Aalim*, ---N.E.3d----, 2016 WL 7449237 (Ohio Dec. 22, 2016) (holding Ohio's mandatory transfer statute for juveniles violates due process under Ohio Constitution).

firearm charges—by operation of statute—automatically remain in this Court.[7] Since Defendant was over fifteen at the time he allegedly committed these offenses, he will not be spared Superior Court proceedings regardless of his arguments for transfer of the companion charges outlined below.[8] Therefore, Defendant's Motion and this ruling focuses solely on the remaining "companion" charges.

### Defendant's Alleged Conduct

The facts that give rise to these charges reveal that at age 15, Defendant allegedly held up a victim at gunpoint while the victim was rolling a blunt cigarette. The victim relinquished $9 and a pack of cigarillos. According to the victim, Defendant had started to back away and was placing the handgun into his pants pocket when the victim thought he "could take him." When the victim attempted to grab him, Defendant fired the gun. Defendant was identified by the victim and also found discarding the firearm on the same day. Subsequently, during the course of this investigation, the alleged relationships between Defendant and some co-defendants gave rise to the gang participation charges. If convicted, Defendant faces a minimum mandatory sentence of fifteen years. His first fifteen years were no better.

---

[7] See 10 *Del. C.* § 1011 (2013 & Supp. 2016); 11 *Del. C.* § 1447A.

[8] See generally *Anderson,* 697 A.2d 379 (answering certified questions; holding weapons charges for defendants age 16 and older are not subject to transfer to Family Court, while reverse amenability hearing is permissible for charges properly joined with weapons charges).

### *Defendant's 15-Year History of*

### *Abuse, Dependency, Neglect, and Mental Health*

At the reverse amenability hearing, Defendant presented expert evidence in support of his Motion that provided a background for the pending charges. The State did not introduce any evidence to dispute or contradict the opinions of Defendant's experts. This evidence included a "Confidential Report of Psychological Evaluation" from a licensed psychologist, Dr. Robin Belcher-Timme, Psy.D, and an "Amenability Report" prepared by Taunya Batista, M.A., a Sentencing Advocate/Mitigation Specialist.[9]

Their reports and testimony painted a troubling picture of Defendant's life.[10] The record reflects that Defendant's numerous traumatic life events, beginning at birth, were far from abnormal in the arc of his short life leading up to the charges in this case. Defendant's mental health, child welfare, and substance abuse histories include:

---

[9] The evidence from their curricula vitae shows that Ms. Bautista holds a Masters in Criminal Justice and Dr. Timme has a doctorate in Psychology, as well as three Master of Arts degrees in Criminal Justice, Clinical Psychology, and Secondary English Education.

[10] Defendant was born prematurely on July 6, 2000. His mother was a child-parent, a sixteen-year-old freshman at A.I. DuPont High School, with substance abuse issues. His father "wanted to be a drug dealer" and to "raise a criminal" he continuously exposed his son to criminal behavior; arrested for trafficking offenses in the same month Defendant was born.

- **Mental health history** (from his records with the Division of Prevention and Behavioral Health Services ("PBH")): Defendant was diagnosed with ADHD, Oppositional Defiant Disorder ("ODD"), and Mood Disorder.

- **Child welfare history** (from the Division of Family Services)—Evidence of severe domestic violence, child abuse, dependency, and neglect that dates back to when Defendant, as early as one month old, was neglected (e.g., his mother left him in the care of a ten-year-old). At one month old, the Family Court awarded guardianship of Defendant to his maternal grandmother. Moreover, both biological parents had a significant history of substance abuse. Defendant routinely pled with his mother not to force visits with his father. These requests fell on deaf ears and Defendant was frequently a victim of his father's substance-induced rages, including physical abuse. He also witnessed acts of domestic violence by his father against women in his father's house. Defendant was also beaten by other male figures in his life.

- **Substance abuse history**—Defendant's substance abuse started in eighth grade, around the time that his uncle was murdered. His substance abuse history reveals that he used marijuana, Xanax, Percocet, and Promethazine.

It is within this disturbing context that the Court now turns to weigh the factors under 10 *Del. C.* § 1011(b) and the arguments made for and against transfer of the companion charges to Family Court.

7

## STANDARD OF REVIEW

The reverse amenability process has been determined a matter of constitutional entitlement with time-sensitive provisions intended to identify those juveniles who may still be able to return to Family Court.[11] When a juvenile files a motion to transfer all or some of the charges leveled against him, the Court must hold a reverse amenability hearing and weigh the four factors set forth in 10 *Del. C.* § 1011(b).[12]

The Court "may" consider evidence of: (1) "[t]he nature of the present offense and the extent and nature of the defendant's prior record, if any;" (2) "[t]he nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any;" (3) "[w]hether the interests of society and the defendant would be best served by trial in the Family Court or in the Superior Court;" and (4) any "other factors which, in the judgment of the Court are deemed relevant."[13]

Before the Court weighs these factors, however, "the Court must preliminarily determine whether the State has made out a *prima facie* case against the juvenile, meaning whether there is a fair likelihood that [Defendant] will be

---

[11] *See Hughes v. State*, 653 A.2d 241, 249 (Del. 1994) (quoting *Marine II*, 624 A.2d 1181, 1184 (Del. 1993); *Marine v. State*, 607 A.2d 1185, 1209 (Del. 1992) [hereinafter *Marine I*]).

[12] *See, e.g., State v. Harper*, 2014 WL 1303012, at *5-7 (Del. Super. Mar. 31, 2014).

[13] § 1011(b).

convicted of the crimes charged."[14] There is a fair likelihood that the defendant will be convicted if, after reviewing the totality of the evidence presented, it appears that, if the defense does not sufficiently rebut the State's evidence, "the likelihood of a conviction is real. . . ."[15] Furthermore, "[a] real probability must exist that a reasonable jury could convict on the totality of the evidence assuming that the evidence adduced at the reverse amenability hearing stands unrebutted by the defendant at trial."[16]

## DISCUSSION

### *Fair Likelihood of Conviction*

As a threshold issue, the Court finds that there is a "fair likelihood of conviction" in this case. On the firearm charges alone, there is a fair likelihood of conviction. The facts are relatively straightforward. Defendant allegedly held up a victim at gunpoint. The victim reported that Defendant put the handgun into his pants pocket when *the victim* thought he "could take [Defendant]." When the victim attempted to grab him, Defendant fired the gun. Defendant was later identified and found discarding the firearm on the same day. Based on the

---

[14] *Harper*, 2014 WL 1303012, at *5 (citing *Marine v. State*, 624 A.2d 1181, 1185 (Del. 1993) [hereinafter *Marine II*]).

[15] *State v. Mayhall*, 659 A.2d 790, 792 (Del. Super. 1995).

[16] *Id.*

9

foregoing, this Court finds that the State has made out a *prima facie* case against Defendant.

***Weighing § 1011(b)'s Four Factors***

**I.**     **Section 1011(b)'s Catchall Provision: Any Factors Deemed Relevant**

Defendant is both a youth in need of rehabilitation and is also an adult offender. As the Supreme Court noted in *Ayers*: "An individual between the ages of 1[5] and 18 is as capable of violent action as is an older individual."[17] He, therefore, remains an "adult" offender for the PFDCF charges and will be expected to answer to those charges. Notwithstanding this mandate, the analysis available under § 1101(b) asks the Court to weigh certain factors to determine if this 16-year-old Defendant may still be amenable to the State's rehabilitative efforts. In other words, does it make sense for both courts to be involved in the disposition of the case, where a youth can have access to rehabilitative services but also face the consequences of the adult charges?

The Court begins its analysis of § 1011(b)'s four factors by flipping the normal analysis on its head. Traditionally this final, or "catchall," factor is addressed last under § 1011(b). Under this factor, the Court may consider any factors "which, in the judgment of the Court are deemed relevant." The Court purposely starts with this final factor because it was impliedly the State's primary

---

[17] *State v. Ayers*, 260 A.2d 162, 171 (Del. 1969).

and only argument against transfer, and because Defendant presents a unique argument in favor of transfer that also falls under this factor. Further complicating this analysis is the testimony presented through YRS representative, Jennifer Skinner, related to the YRS policies/practices, and the practical effect they have on a youth if the Court decides to transfer the case back to Family Court.

Defendant makes an excellent argument that this catchall factor weighs in his favor where the delay uniquely associated with this case is highly relevant to the Court's analysis. Defendant emphasizes that this is a 28-defendant gang participation case and trial is not scheduled until the end of this year. Assuming the best case scenario (i.e., no continuances or other delays in this case), Defendant has been detained since he was fifteen in May 2016 and he will be nearly halfway to eighteen when he gets to trial. Defendant suggests that if some of his charges are transferred back to Family Court, he is still young enough to receive up to five years of Family Court supervision, and at least two and a half years of rehabilitative services, and then return to this Court to face his adult firearm charges.

The Court agrees that Defendant's age and rehabilitation opportunities are highly relevant. Although months or years might not be an unusual timeframe for a case to get to trial, for purposes of amenability, it is highly relevant, especially, for this juvenile Defendant. By age fourteen, he was on the radar of all three

11

divisions charged with addressing his multi-faceted and complex issues. For the eighteen months he remains incarcerated through YRS, he goes without "services," as those terms are defined by DSCYF from the sister divisions in DFS, PBH, and YRS.[18] The argument successfully makes the point that services and time are still available to him at YRS if sent back to Family Court. Unfortunately, YRS will not service him while he carries adult charges. This result places this youth between the proverbial rock and hard place, and is at the core of the State's position against a transfer.

The State argues, as it often does, that because it has *charged* Defendant with firearm offenses that invoke this Court's exclusive jurisdiction, the companion charges are inextricably intertwined with the firearm charges for which transfer is unavailable. Accordingly, the State essentially argues that, notwithstanding the other § 1011(b) factors, this factor is determinative and strongly suggests that this Court should retain jurisdiction over the companion charges.

The problem with the State's argument is that it places undue emphasis on one catchall provision among the other § 1011(b) factors. The State's

---

[18] This is not to say that he is not receiving some support at the detention center. However, it is misguided to suggest that he is receiving therapy while detained. Except for Cognitive Behavioral Therapy ("CBT"), this "therapy" is not addressing his mental health diagnoses, his substance abuse problems, or child welfare needs. Educationally, he may be getting schooling but it does not appear that he has access—nor has he been assessed for—special education services despite his obvious cognitive and developmental challenges.

contention—that the Court's exclusive jurisdiction over the PFDCF charges is dispositive as to the companion charges—was addressed in *State v. Anderson* where the Supreme Court expressly rejected the State's position that a juvenile was not entitled to a reverse amenability hearing (for the remaining charges) because it had charged him with these enumerated firearm offenses.[19] *Anderson* recognized the importance of the reverse amenability process as "providing a judicial check on prosecutorial overcharging—a function with implications of important equal protection and due process guarantees in the prosecution of certain offenses."[20]

Moreover, from a statutory construction perspective, it would ring inconsistent for the General Assembly to enumerate certain explicit statutory factors in § 1011(b), but permit the State's charging decision to override these express factors.[21] Were the State's charging decision the sole determinative factor at the reverse amenability stage, the result would necessarily be that, whenever the State charged a juvenile with PFDCF, this charging decision would force the companion charges to remain in this Court no matter how much the other statutory factors leaned towards transfer. If the legislature intended this result when it

---

[19] *See State v. Anderson*, 697 A.2d 379, 384 (Del. 1997) ("The State's argument does not square with the plain language of [§ 1011].").

[20] *Id.* (quoting *Hughes*, 653 A.2d at 245; *Marine I*, 607 A.2d at 1209-12).

[21] *Cf. id. See also Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) ("The rules of statutory construction are well settled. The goal, in all cases, is 'to ascertain and give effect to the intent of the legislature.' If the statute is unambiguous, there is no room for interpretation, and the plain meaning of the words controls.").

placed PFDCF in the exclusive jurisdiction of this Court, then there would be no reason for this Court to review the statutory factors expressly set out under § 1011.[22] An automatic transfer would occur. To make judicial review a *pro forma* exercise not only runs counter to the rulings in *Marine I and II, Hughes,* and *Anderson,* it is flawed based on recent United States Supreme Court decisions that have struck down automatic provisions without judicial oversight for juvenile offenders as unconstitutional.[23] Nonetheless, the evidence presented through YRS highlights the flaws in our current system and our reverse amenability considerations.

The State agency, or DSCYF through YRS, presents a curious stance on how the agency will process the delivery of juvenile justice services to Defendant even if this Court determines that he is amenable to the Family Court. Although not statutorily mandated, YRS will not provide services if Defendant has *pending adult charges* in this Court. The practical reality, as this Court has determined in prior reverse amenability decisions, is that since YRS will not provide services while a juvenile has pending adult charges, severance of the charges would only

---

[22] *Cf. Rubick,* 766 A.2d at 18.

[23] *See, e.g., Miller v. Alabama,* 132 S.Ct. 2455 (2012) (mandatory life imprisonment without parole statute for juveniles violates Eight Amendment; fact-finder must have opportunity to consider mitigating circumstances before imposing such penalty). *See also State v. Aalim,*--- N.E.3d----, 2016 WL 7449237 (Ohio Dec. 22, 2016) (holding Ohio's mandatory transfer statute for juveniles violates due process under Ohio Constitution).

14

serve to delay services because the Defendant is forced to remain at the detention center pending disposition of his Superior Court charges.[24] One would suggest that the logical solution would be to resolve the adult charges first. However, Ms. Skinner testified that if a youth is convicted as an adult offender, he is no longer considered a youth, and cannot receive services through YRS. Moreover, it will not provide services to a youth to age twenty-one even if the Family Court extended its jurisdiction accordingly.[25]

The YRS policies raise two concerns. YRS has custody of a juvenile and is responsible with providing services to youth until age nineteen yet will not do so while the youth has pending *charges* as an adult offender. The testimony from YRS was that the State's charging decision alone makes him non-amenable. This is regardless of Defendant's ability to respond to rehabilitation or the likelihood that the State will obtain an adult conviction. Second, YRS remains mandated to only provide services to a youth to age nineteen, regardless of whether the Family Court extends its jurisdiction to age twenty-one. The result appears to be a *de facto* deprivation of services to a youth who may be amenable to the Family Court.

---

[24] Ms. Skinner cited staff security reasons as reasons youth with pending services should not be "mixed" with adjudicated youth. Since they face adult charges, they are likely not going to be incentivized to behave while in youth facilities.

[25] *See* 10 *Del. C.* §§ 928-29 (2013 & Supp. 2016) (outlining Family Court's ability to extend jurisdiction over certain juveniles up to age 21).

This catch-22 effect of the YRS administrative policies hamstrings this Court's analysis. Even if a determination is made that both courts should remain involved in the disposition of charges against a juvenile offender because he is both amenable to services as he transitions into adulthood, and shall remain answerable to the adult offenses, the fact that the agency charged with servicing him will not do so is a significant factor. When cross-examined, Ms. Skinner testified that she was unsure how these policies came into being and confirmed that they did not appear to be statutorily mandated.

Where YRS will prohibit access to services post-adjudication if a juvenile has pending adult charges, the State has routinely dovetailed this policy in support of its argument against a transfer. It follows that traditional arguments of severance and joinder under Rules 8 and 14 have prevailed to persuade the Court against transfer as both judicially economic and to avoid the delay of services as a "relevant" factor. The policies of YRS have made it easy for the State to simply state that—due to its charging decision—transfer is unavailable, unnecessary, or meaningless. This is accurate. Unfortunately, it also runs counter to the intent of 10 *Del. C.* § 1011, making the reverse amenability process for a juvenile facing adult offenses an exercise in futility for the youth and a rubber-stamping waste of judicial resources for the Court.

16

The time-sensitive nature of reverse amenability requires a defendant file the motion for transfer within 30 days of arraignment, and for this Court to hold a hearing within 30 days of said filing.[26] The sense of urgency exists for juveniles, unlike for adults, because the proverbial window is closing each day for the rehabilitative services offered only through YRS and Family Court. YRS policies, however, do not appear to be in sync with the same sense of urgency intended by General Assembly. The policies vitiate the spirit of § 1011 and impede the time-sensitive nature of the reverse amenability process.

As to the "catchall" provision, this Court reluctantly must accept that a transfer to Family Court would do nothing but delay Defendant's access to services while he remains detained awaiting disposition of his adult charges. The only efficient choice is to keep the charges together so that Defendant is working solely with one Court. This factor weighs against a transfer.

## II. Section 1011(b) Factor One: Nature of Present Offense and Extent and Nature of Defendant's Prior Record

Albeit somewhat a *pro forma* exercise for the reasons above stated, § 1011(b) directs the Court to look at the present offense and then the extent and nature of Defendant's prior record. As to this factor, the offenses are manifestly serious: he is facing violent felonies that carry lengthy minimum mandatory prison

---

[26] 10 *Del. C.* § 1011(c).

sentences. This clearly weighs against a transfer. However, the second prong of the first § 1011(b) factor weighs in favor of transfer.

While Defendant has a long history of child abuse and behavioral and mental health through DFS and PBH, his juvenile delinquency history through YRS is minimal. His first arrest came at age thirteen for Driving Without a License for riding his mother's mini bike. This charge was *nolle prossed.* Notably, the State presented evidence from Ms. Skinner who testified that, because his history is minimal, but for the PFDCF charges, he would be amenable to the services of YRS.

In June 2015, Defendant became active for the first time with YRS at age fourteen when charged with serious charges, including Robbery First Degree. The charges stayed in Family Court and were *nolle prossed,* except for an adjudication of delinquency for Conspiracy Third Degree. He was ordered to Wraparound Delaware where the response was good. He was successfully discharged from this program on March 31, 2016 and completed his community service with a construction company. He was compliant when placed on pre-trial supervision and was otherwise successful during his probationary period.

Defendant's criminal record consists of two incidents, albeit serious, at the age of fourteen and fifteen respectively. In other contexts, the United States Supreme Court has recognized the "mitigating qualities of youth," which includes

18

a judicial and scientific recognition of the juvenile's proclivity to act impulsively and irresponsibly due to innumerable intrinsic and extrinsic factors.[27]

Analogously, and given Defendant's age in this case, this factor splits in favor of a transfer. While the charges are serious, the nature and extent of his prior record occurred within a one-year period when Defendant was between fourteen and fifteen-years old and he complied with the rehabilitation efforts favorably. All evidence suggests he is amenable to transfer but the YRS policies would result in his continued detention pending disposition of his adult firearm charges.

## III. Section 1011(b) Factor Two: Nature of Past Treatment and Rehabilitative Efforts and Defendant's Response Thereto

The next § 1011(b) factor assesses "[t]he nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any." This Court finds that this factor weighs in favor of transfer.

---

[27] *Miller v. Alabama*, 132 S.Ct. 2455, 2467 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). *Roper v. Simmons* and its progeny reflect the greater attention that is now placed on the peculiarities inherent in juvenile conduct. *See Roper v. Simmons*, 543 U.S. 551 (2005). *See also Montgomery v. Louisiana*, 136 S.Ct. 718 (2016); *Miller*, 132 S.Ct. 2455; *Graham v. Florida*, 560 U.S. 48 (2010). This Eight Amendment jurisprudence recognizes that juveniles possess a "lack of maturity and . . . underdeveloped sense of responsibility" that leads to reckless, impulsive, and heedless risk-taking. *Roper*, 543 U.S. at 569 (quoting *Johnson*, 509 U.S. at 367). They "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers. *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). Juveniles have limited "control . . . over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* (citing Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 AM. PSYCHOLOGIST 1009, 1014 (2003)). And because a child's character is not as "well formed" as an adult's, his traits are "less fixed" and his actions are less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.* at 570 (citing ERIK H. ERIKSON, IDENTITY: YOUTH AND CRISIS (1968)).

19

Despite Defendant's behavioral/mental health needs, educational challenges, and violent/traumatic familial environment, Defendant stayed out of the juvenile justice system. Four months prior to his first YRS placement, when Defendant was fourteen and a half years old, Defendant's uncle was murdered while recording music at the Rose Hill Community Center. This relative was Defendant's healthy male role model; a "real uncle" who played basketball with Defendant. Notwithstanding this traumatic loss, no grief treatment or counseling was ever provided to Defendant. This time period appears to coincide with the beginning of Defendant's substance abuse history, at age fourteen. No substance abuse counseling or treatment was provided.

From an educational standpoint, Defendant's academics were at risk for math, reading, and writing, and it is unclear why he was not assessed for special education services. A review of his education records reveals that he struggled with his behavior and academics for years, which required Rockford Center placements. At age thirteen, mental health service providers, through PBH, ordered or recommended services for Defendant. However, his family did not follow-up and he went without services. At age fourteen, Delaware Guidance Services recommended services for his mental health diagnoses, including ODD. For reasons that are not clear, all services were discontinued, likely due to his admission at Rockford Center.

As to this factor, Defendant faced inordinate challenges with little assistance from the adults in his life, except from perhaps his maternal grandmother. By way of reference, Defendant's history is different than the defendant in *State v. Benson*, where the Superior Court denied the transfer to Family Court of a seventeen-year-old charged with firearms and companion charges.[28] The Court noted, in weighing the § 1011(b) factors, that:

> In terms of his social development, there is no indication that this Defendant was subject to physical or emotional abuse by his family, nuclear or extended. Equally absent is evidence of involvement with alcohol or illegal drugs. Lastly, at the time of the hearing, he was still enrolled as a student in a local public high school.[29]

This Court finds that Defendant received minimal prior treatment. However, what little treatment he received he complied with and successfully completed. As such, the second § 1011(b) factor weighs in favor of a transfer to Family Court, deemed meaningless unless the agency agrees to provide services while Defendant has pending adult charges.

## IV.  Section 1011(b) Factor Three: Whether the Interests of Society and Defendant Are Served by Trial in Family Court or Superior Court

As to the third § 1011(b) factor, the Court looks at "[w]hether the interests of society and the defendant would be best served by" the transfer to Family Court.

---

[28] 1998 WL 755185 (Del. Super. July 17, 1998).

[29] *Id.* at *2.

21

When assessing this factor, this Court is guided by *State v. Johnson*, where the Superior Court determined that it was "not in the interests of society to place the remaining charges in Family Court for treatment Defendant does not need and that [YRS] cannot provide. . . ."[30]

Dr. Timme and Ms. Batista presented undisputed evidence that Defendant needs services that can be provided through YRS. Ms. Skinner concurred that, *but for* the State's charging decision on the firearm offenses, Defendant is amenable to the services they could offer at YRS. This factor also weighs in favor of a transfer.

## CONCLUSION

Defendant moved through the spectrum of the DSCYF, identifying first as a child who was neglected, dependent and abused. It is not uncommon to see how these traumatic adverse childhood events would affect his behavioral and mental states. Left untreated, it should come as no surprise that Defendant landed in the criminal justice system.

Interestingly, the undisputed evidence was promising. YRS and Defendant's experts established that Defendant is amenable to Family Court if transferred back. After weighing the § 1011(b) factors, this Court finds that although amenable, the rationale for a transfer would meet resistance under existing YRS policies that focus on the pending adult firearm charges. Given the current state of the

---

[30] 2012 WL 2835024, at *4 (Del. Super. June 15, 2012).

22

DSCYF/YRS structure, the charging decision of the State has the effect of automatically forcing the matter to remain in this Court. Should YRS be amenable (no pun intended) to modify its existing policies, the Court's ruling would have been different. The hope is that YRS will review its existing practices to better comport with the mandates and the spirit of our juvenile transfer system.

Therefore, Defendant's Motion to Transfer his companion charges must be **DENIED**.

**IT IS SO ORDERED.**

_____
Vivian L. Medinilla
Judge

oc: Prothonotary
cc: Patrick J. Collins, Esquire
Mark. A. Denney, Esquire
Jennifer Skinner, Master Family Service Specialist

23